# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| WISMER DISTRIBUTING CO., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-03-5897 |
| | § | |
| BRINK'S INCORPORATED, | § | |
| | § | |
| Defendant. | § | |
| | § | |

## MEMORANDUM AND OPINION

In this diversity case, Wismer Distributing Co. sued Brink's, Incorporated, asserting state-law causes of action for breach of contract, negligence, breach of fiduciary duty, and violations of the Texas Deceptive Trade Practices Act, TEX. BUS. & COM. CODE § 17.41 *et seq*. The claims arise from the parties' 2002 armored transportation Service Agreement. For six months, Brink's transported deposits from Wismer's place of business to a designated bank, four times each week, without incident. On May 5, 2003, two thieves impersonating Brink's employees went to Wismer at the usual pick-up time, obtained a $400,000 deposit from a Wismer employee, and drove away. Needless to say, they did not go to the bank. Wismer's loss totaled $129,145.71 because it was able to stop payment on the checks. The cash has not been recovered and the loss was not covered by insurance. Brink's has moved for summary judgment as to all claims, arguing that it fully performed its duties under the

Service Agreement and that the Agreement unambiguously allocated the risk of loss to Wismer. (Docket Entry No. 25). Wismer responds that the theft resulted from the failure by Brink's to provide adequate instruction to its client on how to identify bona fide Brink's messengers and argues that there are triable issues of fact as to whether Brink's is liable for the stolen deposit. (Docket Entry No. 27).

Based on the pleadings, the motion and responses, the parties' submissions and the applicable law, this court grants summary judgment for Brink's and, by separate order, enters final judgment. The reasons for this ruling are set out below.

## I.     Background

Wismer is a Texas corporation in the beer distribution business. For the past fifty years, Wismer has delivered Anheuser-Busch products to bars, restaurants, and grocery stores in East Harris County. Brink's is a Delaware corporation in the business of providing secured transportation services. Wismer initially filed this suit in Texas state court, and Brinks removed on the basis of diversity jurisdiction.

### A.     Factual Background

The summary judgment record consists of deposition excerpts from Jim Ferris and Gary Englert; the representatives of the bank that arranged for the Service Agreement on Wismer's behalf; James Coker, Wismer's general manager, who signed the Service Agreement; and Kris McKee, the Wismer employee who delivered deposits to Brink's messengers before the theft and mistakenly delivered the deposit to the Brink's imposters in May 2003. The record also contains excerpts from the depositions of two Brink's

employees, Larry Emmons, a sales representative who handled Wismer's account, and Philip Drum, a manager who supervised the Houston service area.  (Docket Entry No. 27).   Most of the relevant facts are undisputed.

Wismer is paid in cash or by checks when it delivers beer to its customers.  In making deliveries, Wismer uses trucks equipped with safes so that its employees can safely store the money between deliveries and while driving back to the warehouse.  The Wismer truck drivers deliver the money they receive to the accounting office at the Wismer warehouse, where the cash and checks are stored in a safe.  Before November 2002, when Wismer entered into the Service Agreement with Brink's, Wismer's general manager, James Coker, made daily trips to the bank to deposit the proceeds from the prior day's deliveries.  Coker used no special vehicle and had no security on these trips.

In the fall of 2002, Crosby State Bank approached Wismer about using its banking services.  To persuade Wismer to switch banks, Crosby State Bank offered to arrange and pay for armored car service so that Coker would not have to transport the cash deposits himself.   Jim Ferris from Crosby State Bank contacted Brink's and spoke to sales representative Larry Emmons.  Ferris asked for a one-year service contract for cash transport from Wismer's warehouse to the Crosby State Bank, four days a week.  The Brink's armored car division usually handles cash transports, but that division could not perform the same-day pick up and deposit on the schedule Ferris requested.  The use of an armored car would have required overnight storage with Brink's and next-day deposit at the bank. (Docket Entry No. 27, Ex. 7, pp. 11-12).   The Brink's ATM division, which uses similar vehicles and

procedures, was available to make the same-day deposits.  Ferris and Emmons agreed that

the Brink's ATM division would provide same-day pick-up and delivery service every

Monday, Wednesday, Thursday, and Friday, taking cash and checks from Wismer's

warehouse to the Crosby State Bank, at the rate of $357.50 a month.

On November 6, 2002, Coker, Ferris, and another Crosby State Bank employee met

with Emmons to execute the Service Agreement.  The parties used a Brink's standard service

agreement contract, which stated in part as follows:

### II.  BRINK'S RESPONSIBILITIES

1.  Brink's shall:

(a) call for Shipments said to contain Property at the Pick Up
Location;

(b) give a receipt for Shipments received by Brink's; and

(c) deliver such Shipments in like condition to the Delivery
Location and obtain a receipt for such delivery.

The Services will be performed during Brink's regular business
hours as scheduled by Brink's at the time its regular route is in
the immediate area of the Pick Up Location and Delivery
location . . . unless otherwise specified in this Agreement.

2.  Brink's shall provide other Services to Customer as specified
and at the charges set forth in this Agreement.

### III.   CUSTOMER'S RESPONSIBILITIES

1.  Customer shall prepare all Property to be delivered to Brink's
in Distinctively and Securely Sealed containers.

2.  Customer shall declare the actual value of each Shipment

transported by Brink's under the Agreement.  Customer shall not conceal or misrepresent any material fact or circumstance concerning the Property delivered to Brink's, and in the event of loss Customer is to be bound by its declaration of value.

3.   To the extent a Shipment contains Fragile Property, Customer agrees to identify it as Fragile Property. . . .

## V.   BRINK'S   LIABILITY;   LIMITATIONS; EXCLUSIONS

1.   Except as specifically set forth in this Agreement, Brink's shall be liable for the Loss of a Shipment, up to and including the Maximum Liability Amount.   Brink's liability shall commence when the Shipment has been received into Brink's possession and a receipt given for such Shipment by Brink's and shall terminate when the Shipment has been delivered to the Delivery Location or returned to the Pick Up Location  in the event that delivery cannot reasonable be made by Brink's. . . .

6.  Brink's shall not be liable for non-performance or delays of Service caused by strikes, lockouts or other labor disturbances, riots, authority of law, acts of God or means beyond Brink's control.   The foregoing limitation does not affect Brink's liability in the event of a Loss of Property up to the Maximum Liability Amount.
 . . .

8.  Brink's is not an insurer under this Agreement.  Brink's shall not be liable under any circumstance for consequential, special, incidental, indirect or punitive losses or damages (including lost profits, interest or savings) whether or not caused by the fault or negligence of Brink's and whether or not Brink's had knowledge that such losses or damages might be incurred.

(Docket Entry No. 25, Ex. A).[1]  Under the Service Agreement, Brink's had a maximum

---

[1]  The Service Agreement also states that "Customer agrees to look only to the provisions of this Agreement for any claim against Brink's relating to Customer's Property. []This Agreement and the applicable Schedules . . . constitute the entire agreement between Customer and Brink's with respect to the subject matter hereof and supersede and cancel any and all prior and/or contemporaneous offers, negotiations,

liability of $300,000.00 for each shipment.

Before Coker signed the Service Agreement, Emmons explained the Brink's procedures, telling Coker that on the first day of service, Wismer would receive a photo identification signature list and a customer receipt book. (Docket Entry No. 27, Ex. 6, pp. 27-28). The customer receipt book is a book of forms the Brink's client was to use to record each pick-up. The forms had columns for the date, the consignee, the contents of the shipment, the bag or seal number, the number of items, and the signature of the Brink's messenger who received the shipment. The cover page of a Brink's customer receipt book contains the following warning:

> WARNING: Please examine carefully the signature of the Brink's representative who receipts for the shipments recorded herein. Be sure that his facsimile signature appears on Brink's current identification notice. If in doubt, please call Brink's office before releasing the shipments.

(Docket Entry No. 27, Ex. 9). An "identification notice" is a list of the Brink's employees who are authorized to accept shipments from a particular customer. The identification notice includes a picture of the authorized employees and their signatures. Each identification notice is dated, numbered, and contains the following directions:

> Facsimile signatures for the purpose of identification, all employees . . . currently authorized to call for shipments and to receipt therefore are as shown on this notice. All previous notices are revoked. If there is any question as to the authority of the person presenting themselves as a Brink's representative, please telephone our office to verify. This is a new

_____

promises, exceptions and understandings, whether oral or written, express or implied between the parties." (Docket Entry No. 25, Ex. A, § X, ¶¶ 5-6).

> authorization . . .  you are cautioned to compare photos and
> actual signatures of all persons. . . .This notice which supercedes
> all prior notices is effective immediately and will continue until
> further notice is received.

(Docket Entry No. 27, Ex. 10).

After the initial November 6, 2002 meeting with Coker, Emmons created a service

order for a receipt book and a photo log to be delivered to Wismer.  (*Id.,* Ex. 13).  Wismer,

however, asserts that it never received an identification photo log or a customer receipt book.

Emmons and Philip Drum, manager of the Houston ATM division of Brink's, both stated in

their depositions that the initial messenger usually delivered such materials and they did not

know whether Wismer received them.  (*Id.,*Ex. 6, pp. 34-36; Ex. 7, p. 63).  Brink's did not

provide any written instructions on how to identify a legitimate Brink's messenger, other

than the instructions provided on the cover of the customer receipt book.

Brink's picked up Wismer's deposits and delivered them to the Crosby State Bank for

six months without incident.  Kris McKee at Wismer prepared the shipments for Brink's.

The messenger would come to Wismer's warehouse, with no advance telephone call

announcing the intended arrival.  The messenger would ring an outside doorbell.  McKee

would answer the door and deliver the deposit.  Brink's usually sent the same messenger,

Deryl Babineaux, to pick up Wismer's deposits.  On a few occasions, Brink's sent a route

supervisor to pick up the Wismer deposit.  Babineaux and the supervisors wore the Brink's

uniform consisting of a light blue shirt, a Brink's ID security badge, black pants, black boots,

and a sidearm.  (Docket Entry No. 27, Ex. 7, p. 31).  Babineaux or the supervisors would sign

a receipt book, but it was not an official Brink's customer receipt book.

On May 5, 2003, a white van carrying two men arrived at the Wismer warehouse.[2] The driver of the van did not leave the vehicle.  The other man, impersonating a Brink's messenger, rang the outside doorbell and spoke with McKee, who delivered the deposit to the man.  McKee did not realize that anything was wrong until approximately an hour later, when Babineaux, "the regular Brink's guy," showed up to receive the deposit.  (Docket Entry No. 25, Ex. B).  Following the theft, Wismer notified Brink's, its insurance provider, and the police.

Brink's and the police agreed that the thieves were familiar with Brink's procedure for the Wismer pick up.  Several Brink's employees were questioned and given polygraph examinations.  McKee described the thief who received the deposit for a composite artist and gave a written statement describing the incident.  McKee was unsure if the messenger thief wore a blue uniform or if he was wearing black clothing.  The thief did not have a Brink's security badge and did not carry a sidearm as the regular messengers did, but he was carrying a bag with "Brink's " printed on it.  McKee was unable to provide a description of the driver and there were no other witnesses. The camera surveillance system at the Wismer warehouse was not working on the day the theft occurred.  (Docket Entry No. 25, Ex. C, p. 4).  No arrests were made.

The day after the theft, Phillip Drum learned that McKee had not been using a

---

[2]  The ATM division of Brink's uses two different types of vehicles, trucks, and vans.  The ATM trucks are indistinguishable from the trucks used in the armored car division.  The ATM vans are Ford Econoline white service vans with specially modified window configurations, but the van has no identifying Brink's marks.  When asked whether a lay person could tell an unmodified Ford Econoline van from the Brink's modified version, Drum replied "it depends on the lay person."  (Docket Entry No. 27, Ex. 7, pp. 29-30).

Brink's-issued customer receipt book.  McKee had created a log for the Brink's pick-ups. She told Drum that she did not know about a "customer receipt book."  (Docket Entry No. 27, Ex. 7, p. 66).  The signature log that McKee kept showed that on March 20, 2003, Brink's sent John Rodriguez, a field supervisor to pick up the deposit.  Rodriguez did not report that he was asked to sign a signature log that the client had created, as opposed to the Brink's-issued customer receipt book.  (*Id.,* pp. 40-41).

After the theft, Brink's continued to pick up and deliver Wismer's cash deposits.  At Wismer's request, Brink's agreed to change its procedures to have its dispatcher telephone the warehouse to notify Wismer when the driver was en route to pick up the deposit.  (*Id.,* p. 50).

## B.    Wismer's Claims and the Motion for Summary Judgment

Brink's argues that the Service Agreement is unambiguous; that the undisputed facts show that it fully performed its contractual obligations to pick up deposits from Wismer's business and deliver the deposits to the bank; and that there is no basis for any implied warranty or negligence cause of action, as a matter of law.  Wismer responds that the summary judgment evidence raises triable issues of fact as to its claims for breach of contract, negligence, and breach of an implied warranty to perform contractual duties in a workmanlike manner.[3]  Wismer argues that Brink's breached its express contractual duty to "call for shipments"; breached its implied contractual duty of workmanlike performance, which

---

[3]  After the parties conducted discovery, Wismer abandoned the DTPA claim and the breach of fiduciary duty claim. (Docket Entry No. 27, p. 13).

9

required Brink's to provide adequate instructions on how to identify a Brink's messenger; and

breached an implied warranty of good and workmanlike performance. (Docket Entry No. 27).

## II.    The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the

moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56.  Under FED.

R. CIV. P. 56(c), the moving party bears the initial burden of "informing the district court of

the basis for its motion, and identifying those portions of [the record] which it believes

demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*,  477

U.S. 317, 322 (1986); *Stahl v. Novartis Pharmaceuticals Corp.*, 283 F.3d 254, 263 (5th Cir.

2002).  If the burden of proof at trial lies with the nonmoving party, the movant may either

(1) submit evidentiary documents that negate the existence of some material element of the

opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear

the ultimate burden of proof at trial, demonstrate the evidence in the record insufficiently

supports an essential element or claim. *Celotex*, 477 U.S. at 330.  The party moving for

summary judgment must demonstrate the absence of a genuine issue of material fact, but need

not negate the elements of the nonmovant's case. *Bourdeaux v. Swift Transp. Co., Inc.,* 402

F.3d 536, 540 (5th Cir. 2005). "An issue is material if its resolution could affect the outcome

of the action." *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th

Cir.2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91

L.Ed.2d 202 (1986)).  If the moving party fails to meet its initial burden, the motion for

summary judgment must be denied, regardless of the nonmovant's response. *Baton Rouge*

10

*Oil & Chemical Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmoving cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim. *Johnson v. Deep E. Texas Reg'l Narcotics Trafficking Task Force,* 379 F.3d 293, 305 (5th Cir.2004). The nonmovant must do more than show that there is some metaphysical doubt as to the material facts. *Armstrong v. Am. Home Shield Corp.,* 333 F.3d 566, 568 (5th Cir.2003).

Affidavits supporting or opposing summary judgment must "set forth facts that would be admissible in evidence." FED. R. CIV. P. 56 (e); *see Love v. Nat'l Med. Ctr.*, 230 F.3d 765, 776 (5th Cir. 2000). Material that is inadmissible will not be considered on a motion for summary judgment because it would not establish a genuine issue of material fact if offered at trial. *See Pegram v. Honeywell, Inc.,* 361 F.3d 272, 285 (5th Cir. 2004).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Cabillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir. 2002); *Anderson*, 477 U.S. at 255. "Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)(quoting *Celotex*, 477 U.S. at 322).

**III.   Analysis**

11

### A.      The Breach of Contract Claim

Wismer bases its breach of contract claim on the Service Agreement language that requires Brink's to "call for Shipments said to contain Property at the Pick Up Location." (Docket Entry No. 25, Ex. A, §II-1).  Brink's argues that "call for" simply means that Brink's would come to Wismer's warehouse to pick up the shipments.  Wismer argues that this provision required Brink's to telephone Wismer in advance to notify it of the imminent arrival of the Brink's messenger.  Wismer alternatively argues that the contract is ambiguous as to whether "call for" means to telephone in advance or to come to a specific location for a brief period to pick up the deposit.

To recover for breach of contract, a plaintiff must show  (1) the existence of a valid contract, (2) performance or tendered performance, (3) breach of the contract by the defendant, and (4) damages resulting from the breach.  "A breach of contract occurs when a party fails or refuses to perform an act that it expressly promised to do."  *Methodist Hosps. v. Corporate Communicators, Inc*., 806 S.W.2d 879, 882 (Tex.App.– Dallas 1991, writ denied).  Whether a party has breached a contract is a question of law for the court. *See Willis v. Donnelly*, 118 S.W.3d 10, 25-26 (Tex.App.– Houston [14th Dist.] 2003, no pet.); *Chappell Hill Bank v. Lane Bank Equip. Co.*, 38 S.W.3d 237, 245 (Tex.App.– Texarkana 2001, pet. denied). "The court determines what conduct is required by the parties and, insofar as a dispute exists concerning the failure of a party to perform the contract, the court submits the disputed fact questions to the jury." *Willis,* 118 S.W. 3d at 25 (quoting *Meek v. Bishop, Peterson & Sharp, P.C.*, 919 S.W.2d 805, 808 (Tex.App.– Houston [14th Dist.] 1996, writ

12

denied)).

"In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument." *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003); *Petula Associates, Ltd. v. Dolco Packaging Corp.*, 240 F.3d 499, 504 (5th Cir. 2001). Courts examine and consider the contract as a whole and give effect to all provisions of the contract. *Coker v. Coker,* 650 S.W.2d 391, 393-94 (Tex. 1983). If the contract is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law. *Id.* Texas courts interpret the terms of a contract "from a utilitarian standpoint bearing in mind the particular business activity sought to be served" and "will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive." *Reilly v. Rangers Mgmt., Inc*., 727 S.W.2d 527, 530 (Tex. 1987). As a last resort, if all other ordinary rules of construction leave reasonable doubt as to interpretation of a contract, the court should construe a contract against its drafter. *Forest Oil Corp. v. Strata Energy, Inc.*, 929 F.2d 1039, 1043 (5th Cir. 1991).

Extrinsic evidence is not admissible to contradict or vary the meaning of unambiguous language in a written contract and may not be used to create an ambiguity. *See Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996); *see also Friendswood Dev. Co. v. McDade and Co.*, 926 S.W.2d 280, 282-83 (Tex. 1996)(per curiam). The determination of whether a contract is ambiguous is made by looking at the agreement as a whole in light of the circumstances present when the parties entered into the contract. *See*

*Coker,* 650 S.W.2d at 394.  An ambiguity does not arise simply because the parties advance conflicting interpretations of the contract.  *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex. 1994).  "If the agreement is ambiguous, summary judgment is improper because interpretation of the agreement is a fact question for the jury."  *Childers v. Pumping Systems Inc.*, 968 F.2d 565, 569 (5th Cir. 1992); *Consolidated Engineering Company, Inc. v. Southern Steel Company*, 699 S.W.2d 188, 192 (Tex. 1985).

The Service Agreement states that Brink's "shall call for Shipments said to contain the Property at the Pick Up Location." (Docket Entry No. 25, Ex. A, § II, ¶ 1).  The parties dispute what "call for" requires Brink's to do.  Brink's asserts that "call for" simply means "to pay a short visit."  Wismer claims that the duty to "call for" deposits requires Brink's to use the telephone to "call and notify their customers of their imminent arrival," (Docket Entry No. 27, p. 11), or that the term is ambiguous.  This court concludes that the meaning of "call for" is unambiguous.  The term "call for" requires Brink's physically to come to Wismer's warehouse to pick up the deposits.  The Agreement states that Brink's will "call for" deposits during "the time [Brink's messenger's] regular route is in the immediate area of the Pick Up Location and Delivery location."  The Service Agreement does not refer to any obligation for Brink's to provide advance notice that the messenger is in the immediate area.  "Call for" is used to describe the physical presence of the Brink's messenger at Wismer's warehouse to pick up the deposit.  The Agreement states that Brink's will "CALL AT:  600 S. Main, Baytown, Texas," a physical address, not a telephone number.

A contract is ambiguous if it is susceptible to two reasonable interpretations.  When

14

the Service Agreement is read as a whole, Wismer's interpretation of "call for" is not reasonable. To interpret "call for" to require that Brink's had to make a telephone call before its messenger arrived at the Wismer warehouse to pick up the deposit requires that "for" be treated as a synonym of "about" and eliminates any requirement that a Brink's messenger physically arrive at Wismer's warehouse to obtain possession of the property. As noted, the Service Agreement ties "call for" to a physical address, and does not mention a telephone number or other means of advance notification of the messenger's arrival.

Wismer's arguments in support of interpreting "call for" to mean a telephone call are not persuasive. Wismer cites to the dictionary definition of "call" and the principle of contra proferentem, typically applied in interpreting standard form contracts and invoked against a party operating at a distinct bargaining advantage. The interpretive rule is based, in part, on a "presumption that the contract drafter is more likely to have reason to know of uncertainties of meaning." RESTATEMENT (SECOND) OF CONTRACTS § 206, cmt. a. Only when a contract is first determined to be ambiguous may the court consider the parties' interpretation, and admit extraneous evidence to resolve the ambiguity. *See Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 732 (Tex.1981); *CBI Indus.*, 907 S.W.2d at 520. Moreover, the record does not support treating Wismer as an unsophisticated party with insignificant bargaining power. Wismer is in the beer distribution business and had the assistance of a bank eager to obtain its business in negotiating the Service Agreement. *See Forest Oil,* 929 F.2d at 1043 (the court should

construe a contract against its drafter as a last resort).[4]

Based on the undisputed facts and the unambiguous language of the Service Agreement, this court grants the motion for summary judgment dismissing the express breach of contract claim.

## B.    The Claim for Breach of Implied Contractual Duties

Wismer's claim for breach of an implied duty to perform a contract in a workmanlike manner is based on the alleged failure by Brink's properly to instruct Wismer employees on how to identify a bona fide Brink's messenger and to ensure that Wismer employees had received and were using the Brink's-issued customer receipt book and photo identification notices.  Brink's argues that Texas law does not provide for an implied duty when, as here, it contradicts the express terms of the contract.

Wismer relies on *Montgomery Ward & Co. v. Scharrenbeck,* 204 S.W.2d 508, 510 (1947).  In *Scharrenbeck,* the Texas Supreme Court stated:  "[a]ccompanying every contract is a common-law duty to perform with care, skill, reasonable expedience and faithfulness the thing agreed to be done, and a negligent failure to observe any of these conditions is a tort, as well as a breach of the contract. . . . [T]he contract creates the relation out of which grows

---

[4] Although it is not necessary to rely on extrinsic evidence, the evidence does not suggest that the parties intended that Brink's messengers would telephone Wismer before the messenger arrived.  The photo identification notices that Brink's ordinarily provides customers contain pictures of messengers who are "currently authorized to *call for* shipments" and caution that "if there is any question as to the messenger's identity, please *telephone* our office to verify."  (Docket Entry No. 27, Ex. 10)(emphasis added).  Providing pictures of authorized messengers who are to "call for" a shipment is consistent with the Service Agreement's description of "call for" as the arrival of the Brink's messenger at the pick-up location.  The use of the word "telephone" confirms that it is not a synonym for "call for."

16

the duty to use care." *Id.* at 510.  In *Scharrenbeck*, the defendant had agreed to repair a water heater in the plaintiff's home. After the repair, the heater caught fire, ignited the roof, and destroyed the plaintiff's home.  In failing to repair the water heater properly, the defendant breached the express terms of its contract.  The Supreme Court held that the defendant also breached the implied duty to act with reasonable skill and diligence in carrying out the contract "so as not to injure a person or property by his performance." *Id.*

In *Scharrenbeck,* the Texas Supreme Court recognized that a tort cause of action can arise from the breach of an express contractual obligation.  The Texas Supreme Court has construed *Scharrenbeck*  as applying the general obligation imposed by tort law to avoid injury to others, an obligation "apart and independent of promises made and therefore apart from the manifested intention of the parties." *Southwestern Bell Telephone Co. v. DeLanney,* 809 S.W.2d 493 (Tex. 1991)(*quoting* W. KEETON,  D. DOBBS, R. KEETON & D. OWEN, PROSSER AND KEETON ON THE LAW OF TORTS § 92 at 655 (5th Ed.1984)); *see also Castle Tex. Prod. L.P. v. Long Trusts*, 134 S.W.3d 267, 272 (Tex.App.–Tyler 2003, pet. denied)(noting that in the absence of an independent tort injury, if a contract spells out the parties' respective rights the contract, not the common law, governs).  Under *Scharrenbeck*, however, "a duty to perform with skill and care attaches only to the performance of the acts the parties agreed to perform."  *City of Austin v. Houston Lighting & Power Co.*, 844 S.W.2d 773, 784 (Tex.App.–Dallas 1992, writ denied).  Although conceding that Texas courts "began to restrict" the *Scharrenbeck*  implied duty to tort law concepts, Wismer contends that Brink's breached an implied duty of workmanlike performance that would have required it to train its

17

customers and provide proper materials, such as the receipt book; to "do those things that, according to common sense and justice, they should do in order to carry out the purpose for which the contract was made."  (Docket Entry No. 27, p. 6).

The duty implied by the tort law not to injure other persons does not apply to this case.  The Texas courts have made it clear that an implied contractual duty to perform in a workmanlike manner must rest on the duties expressly provided in the parties' contract.  As the court stated in *Dancier Oil & Refining Co. of Texas v. Powell*, 137 Tex. 484, 490, 154 S.W.2d 632, 635 (Tex. 1941), "[i]t is not enough to say that an implied covenant is necessary in order to make the contract fair, or that without such a covenant it would be improvident or unwise, or that the contract would operate unjustly."  Id.  The written agreement must provide support for the implied promise:

> [W]hen parties reduce their agreements to writing, the written instrument is presumed to embody their entire contract, and the court should not read into the instrument additional provisions unless this be necessary in order to effectuate the intention of the parties as disclosed by the contract as a whole.  An implied covenant must rest entirely on the presumed intention of the parties as gathered from the terms as actually expressed in the written instrument itself, and it must appear that it was so clearly within the contemplation of the parties that they deemed it unnecessary to express it, and therefore omitted to do so.

154 S.W.2d at 635 (emphasis added).  The only duties of performance for Brink's expressly provided in the Service Agreement are the duties to pick up and deliver prepared deposits. There is no basis to impose an implied covenant to train customers or equip them with certain materials, such as the customer receipt book.

Wismer relies on extrinsic evidence that Brink's intended to provide its customers

18

with materials on how to properly identify a Brink's messenger, but the terms of the Service Agreement unambiguously set out the duties of the contracting parties. The Service Agreement does not state that Brink's agreed to train Wismer employees on how to properly identify a Brink's messenger. To the contrary, the Service Agreement requires Brink's to arrive at the pick up location, give a receipt for the shipment received, and then deliver the shipment to the bank and obtain a receipt from the bank.

The implied duty Wismer asserts is also inconsistent with the express terms of the Service Agreement allocating to the client the risk of loss of a delivery before it is placed in the physical possession of a Brink's messenger. The Service Agreement contains eight paragraphs under the heading "Brink's Liability; Limitations; Exclusions." The first paragraph defines the extent of liability for the "Loss of a Shipment," as follows:

> [V-1] Brink's liability shall commence when the Shipment has been received into Brink's possession and a receipt given for such Shipment by Brink's and shall terminate when the Shipment has been delivered to the Delivery Location. . . .

(Docket Entry No. 25, Ex. A, § V, ¶ 1). Paragraphs 6 and 7 define liability for "non-performance" or "delays." Paragraphs 6 and 7 provide that:

> [V-6] Brink's shall not be liable for *non-performance* or *delays of Service* caused by strikes, lockouts or other labor disturbances, riots, authority of law, acts of God or means beyond Brink's control. The foregoing limitation does not affect Brink's liability in the event of a Loss of Property up to the Maximum Liability Amount.
>
> [V-7] Brink's shall not be liable for *Loss or for non-performance or delays of Service*, liability or expense caused by or resulting from: (1) war. . . (2) insurrection, rebellion, revolution, civil war, usurped power, or action taken by

19

> governmental authority in hindering, combating or defending against such an occurrence or confiscation by order of any government or public authority.

(*Id.,* § V, ¶¶ 6, 7)(emphasis added).  Paragraph 8 states that Brink's is not an "insurer," and excludes "consequential, special, incidental, indirect or punitive losses or damages."  (*Id.,* § V, ¶ 8).

Wismer argues that the loss at issue is not the loss of a "shipment" covered by Paragraph V-1, but rather the result of "non-performance" that is not excluded from liability under Paragraphs V-6 or V-7 of the Service Agreement.  Wismer points out that Paragraphs V-6 and V-7 provide that Brink's is not liable for "non-performance" or "delays of Service" resulting from specified causes, including "acts of God or means beyond Brink's control," and war.  Wismer argues that the loss arose from Brink's's failure to perform an implied duty – to train Wismer employees and provide the materials to enable them to detect a bona fide messenger – rather than from the loss of a shipment or nonperformance due to a specified force majeure event.  Wismer primarily relies on the deposition testimony of Drum and Emmons that Brink's regularly provides its customers with photo identifications of its messengers and a customer receipt book, which Wismer asserts it did not receive.  Wismer emphasizes that imposter theft is a foreseeable risk in armored transportation services and that it relied on Brink's as an expert in secured transport.

The definition of "shipment" is the only provision in the Service Agreement that supports Wismer's argument that Paragraph V-1 does not apply in this case.  The Agreement contains the following definition:

> "Shipment" means one or more sealed containers of Property received by
> Brink's at the same time at a single Pick Up Location, that are to be delivered
> to a single Delivery Location.

(Docket Entry No. 25, Ex. A, § I, ¶ 10).  The $400,000.00 deposit obtained by the thieves

was not "received by Brink's" and does not satisfy this definition.  But an examination of the

remaining provisions of the Agreement undercuts Wismer's argument.  "[C]ourts must be

particularly wary of isolating from its surroundings or considering apart from other

provisions a single phrase, sentence, or section of a contract."  *State Farm Life Ins. v.*

*Beaston*, 907 S.W.2d 430, 433 (Tex.1995).  "Loss" is defined as a loss to "Property," as

opposed to the "loss of a shipment":

> "Loss" means any loss of, damage or destruction to Property.
>
> "Property" means currency, coin, checks, securities, and other
> financial instruments and other valuables as mutually agreed
> upon by Brink's and Customer.

(Docket Entry No. 25, Ex. A, § I, ¶¶ 4,7).  The term "Property" is defined as the contents of

a "Shipment."  Brink's agreed to pick up and deliver "Shipments said to contain Property."

Because Wismer seeks to recover the monetary value of the property in the deposit that was

stolen, the liability allocation of Paragraph V-1 applies.

When read as a whole, the Service Agreement does not contemplate that Brink's

would be liable for Wismer's "property" until Brink's had possession of the property.  This

construction does not make Paragraphs V-6 and V-7 meaningless, as Wismer argues.

Paragraph V-6 applies when specified events – all beyond the control of Brink's – make

Brink's unable to perform pick-up and delivery services, or delays the performance of those

services, but does not affect liability for loss of property once it is in Brink's possession. Paragraph V-7 applies when other, specified force majeure events – including war, nuclear attack, and acts of terrorism – cause not only nonperformance or delay of the contractual duties to pick-up and deliver property, but also result in the loss of property after it is in Brink's possession.[5]  Paragraphs V-1, V-6, and V-7 are consistent and each has meaning. Brink's has no responsibility for loss of a client's property before it comes into Brink's possession and after it is delivered. or, in the event delivery cannot be accomplished, returned to the client.

The Service Agreement does not contemplate that Brink's would be liable for a "loss" to the "property" or "shipment" for "nonperformance" of implied duties, such as training clients' employees to detect a fake Brink's messenger.  The nonperformance provisions refer to Brink's failure to provide "services"– which are defined as picking up a shipment containing property at a specified location, providing a receipt, and delivering the shipment to another specified location.  (Docket Entry No. 25, Ex. A, § II, ¶ 1).  The next sentence after this provision states that "Brink's shall provide other Services to Customer as specified and at the charges set forth in this Agreement,"  (*id.*, ¶ 2), but the Service Agreement does not specify any other "Services."  The Service Agreement does not support Wismer's argument that Brink's assumed additional, implied duties that, if not performed, could lead to liability.  To the contrary, the Service Agreement expressly states the parties'

---

[5]  Paragraph V-7 also states that  "The following limitation shall not apply to property in transit, stored in the ordinary course of transit, or held temporality for subsequent delivery. . .  Brink's shall not be liable for loss, damage, destruction, or for nonperformance or delays of service, liability, cost or expense directly or indirectly caused by, resulting from, or in connection with any act of terrorism. . ."

responsibilities and makes clear that Brink's would not be liable for "property" damaged, lost, or stolen before it came into the possession of Brink's.

Wismer argues that if Brink's is only liable for breach of contractual duties resulting in a loss of property in its possession, Brink's could simply decide not to perform the contract at all without assuming any contractual liability. If such "nonperformance" occurs, however, the result is not a "loss" of property or a shipment, and Paragraph V-1 would not apply. As Brink's points out, if it breached its duty to perform the contractual obligation to pick up a shipment, it would be liable for the cost of obtaining replacement service, unless the force majeure events of Paragraphs V-6 or V-7 had caused the nonperformance.

Wismer argues that if Paragraph V-I applies to exclude liability as Brink's contends, the provision is unenforceable for failure to satisfy the "fair notice" requirements of the express negligence doctrine. Fair notice requires that the intent of the parties must be specifically stated in the four corners of the contract and the clause must be conspicuous. The Texas Supreme Court has held that the fair notice doctrine applies in situations of "extraordinary shifting of risk," in which one party surrenders its legal rights to hold the other party liable for acts of negligence. *Dresser Indus., Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 508 (Tex. 1993); *Lawrence v. C.B. Servs., Inc.,* 44 S.W.3d 544, 553-54 (Tex. 2001), *superseded by* TEX. LAB. CODE ANN. § 406.033(e), (applying doctrine to employee's pre-injury waiver of right to sue for employer's negligence or "actionable conduct"); *Storage Processors, Inc. v. Reyes*, 134 S.W.3d 190, 193 (Tex. 2004)(applying doctrine "to less than total risk shifting because of workers' compensation unique public policy posture"); *compare*

*Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 387 (Tex. 1997)(doctrine not applicable to no-damages-for-delay clause); *Getty Oil Co. v. Ins. Co. of N. Am.*, 845 S.W.2d 794, 806 (Tex. 1992) (fair notice requirements not applicable to insurance-shifting agreement). In the context of professional service contracts, the Texas Supreme Court has approved broad form releases. *Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co.*, 20 S.W.3d 692, 698 (Tex. 2000)(holding broad and generalized release of claims arising from legal services included malpractice claims even though the provisions primarily addressed unpaid fees). "[T]he release must 'mention' the claim to be effective. It does not require that the parties anticipate and identify each potential cause of action relating to the release's subject matter." *Keck*, 20 S.W.3d at 698. (citations omitted).

"Although most contractual provisions operate to transfer risk, a contractual release that frees a party in advance from liability for its own negligence represents an 'extraordinary shifting of risk,' so much so that the risk-shifting provision must be conspicuous, among other things." *Segal v. Emmes Capital, L.L.C.*, 155 S.W.3d 267, 283 (Tex. App.– Houston [1st Dist.] 2004, pet. abated)(citations omitted). In determining whether a clause is conspicuous, a court considers the use of headings, contrasting type, the placement of the clause, and the length of the contract. *Dresser Indus., Inc.*, 853 S.W.2d at 508 (citing TEX. BUS. & COM. CODE ANN. § 1.201(10)). "When a reasonable person against whom a clause is to operate ought to have noticed it, the clause is conspicuous." *Id.*

Paragraph V-1 is not an "extraordinary shifting of risk" like the ones addressed in the cases cited by Wismer. Under Paragraph V-1 and the other liability provisions of the Service

24

Agreement, Brink's is liable for losses to property it agreed to transport after it picks up the property and while it retains possession. The liability limitation requires that Wismer bear full responsibility for safeguarding its own property until the property is given to Brink's. It does not eliminate Brink's responsibility for the property it agreed to transport. As Brink's points out, it assumed full liability for shipments in its possession.

Paragraph V-1 is enforceable and is inconsistent with liability for breach of contract based on the implied duties that Wismer asserts. An implied duty cannot alter the express terms of a contract and the Service Agreement does not otherwise support the implied duties Wismer identifies. This court grants summary judgment dismissing the breach of an implied duty claim.

### C.    The Negligence Claim

Wismer asserts that under the facts, Brink's could be held liable for negligence. In addition to the absence of implied duties and the provisions allocating responsibility for loss, Brink's also argues that Texas law precludes a negligence claim based on an alleged failure to perform a contract when the only injury is economic loss to the subject of the contract.

Under Texas law, negligence requires a "legal duty owed by one person to another, breach of that duty, and damages proximately resulting from breach." *Greater Houston Transportation Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990). The general rule is that *if there would be a cause of action independent of the fact that there is a contract between* the parties, a claim of negligence can survive. *See Southwestern Bell Telephone Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991); *see also Sergeant Oil & Gas Co. v. National*

25

*Maintenance & Repair, Inc*., 861 F.Supp. 1351, 1359 (S.D.Tex. 1994) ("An allegedly negligent failure to perform a contract, standing alone, is not recognized as an actionable tort in Texas."). Although a contract can give rise to both a contract and a negligence cause of action, "[w]hen the injury is only the economic loss to the subject matter of a contract itself the action sounds in contract alone." *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986). Here, the injury is the loss of Wismer's deposits, precisely the subject matter of the Service Agreement.

Wismer points to facts that show that Brink's intended to provide Wismer with a signature log and receipt book when the parties executed the Service Agreement. Larry Emmons, the sales representative for Brink's, stated in his deposition that it was routine procedure to provide new customers with a receipt book and signature log. (Docket Entry No. 27, Ex. 6, pp. 30, 43). Drum acknowledged that the photo log and customer receipt book protect are helpful to protect against imposter theft. (*Id.,* Ex. 7, pp. 20-21). Brink's notes that Emmons had explained the proper pick-up procedure to Coker, the Wismer general manager, and informed him that Wismer would be receiving a receipt book and photo identification signature list with the first pick up. (*Id*., Ex. 6, p. 28). The fact that Brink's intended to supply the materials does not give rise to a duty to safeguard against imposter theft or show an intent to assume liability for shipments delivered to individuals other than Brink's. Texas law makes it clear that when the loss or damage is to the subject matter of a contract, the injured party cannot assert a tort claim, such as negligence, but is limited to a contract cause of action. *DeLanney*, 809 S.W.2d at 494-95. As a matter of law, Wismer

has no cause of action for negligence based on the loss of the deposit, because the subject of the Service Agreement is the pick up and delivery of such deposits.  This court grants summary judgment dismissing Wismer's negligence cause of action.

### D.   The Breach of Implied Warranty Claim

Wismer also argues that it may assert a claim for breach of an implied warranty to perform the contractual duties in a good and workmanlike manner.  Implied warranties are created by operation of law.  The Texas Supreme Court has recognized an implied warranty in a contract for services when the services relate to the repair or modification of existing tangible goods or property or to the sale of a new home, *see Centex Homes v. Buecher*, 95 S.W.3d 266, 273 (Tex. 2002), or "when public policy mandates." *Rocky Mountain Helicopters, Inc. v. Lubbock County Hosp. Dist.*, 987 S.W.2d 50, 52-53 (Tex. 1998).  In *Rocky Mountain Helicopters,* the court made it clear that "[p]ublic policy does not justify imposing an implied warranty for service transactions in the absence of a demonstrated, compelling need." *Id.* at 53.  The court explained that public policy may require the creation of an implied warranty.  The type of example the court cited of such a need – when parties are precluded from a remedy because "privity or reliance requirements or the difficulty of assigning responsibility prevent a wronged consumer from obtaining redress"  – does not apply to the present case, in which the parties agreed to contractual terms allocating the risks. This court grants the motion for summary judgment dismissing the breach of warranty claim.

## IV.     Conclusion

Summary judgment is granted as to the claims against Brink's.  Final judgment will be entered by separate order.

SIGNED on August 2, 2005.

_____
Lee H. Rosenthal
United States District Judge